Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

XIMPLEWARE CORP., a California )
corporation,                   )
                               )
          Plaintiff,           )
                               )
  VS.                          )    NO. C 13-05160 SI
                               )
VERSATA SOFTWARE, INC., f/k/a  )
TRILOGY SOFTWARE, INC., a      )
Delaware corporation; TRILOGY  )
DEVELOPMENT GROUP, INC., a     )
California corporation;        )
AMERIPRISE FINANCIAL, INC., a  )
Delaware corporation; and      )
AMERIPRISE FINANCIAL SERVICES, )
INC., a Delaware corporation,  )
                               )
          Defendants.          )
_____)

                              San Francisco, California
                              Wednesday, December 4, 2013

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                         COMPUTERLAW GROUP LLP
                         401 Florence Street
                         Palo Alto, California  94301
                    BY:  **JACK RUSSO, ATTORNEY AT LAW**
                         **ANSEL HALLIBURTON, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1    **APPEARANCES**:    (CONTINUED)

2    For Defendants Versata Software, Inc., f/k/a Trilogy Software,
     Inc., & Trilogy Development Group, Inc.:

3                        AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI
                            & MENSING
4                        3460 One Houston Center
                        1221 McKinney
5                        Houston, Texas  77010
                   BY:  **AMIR ALAVI, ATTORNEY AT LAW**
6                        **BENJAMIN F. FOSTER, ATTORNEY AT LAW**

7                        VALOREM LAW GROUP
                        60 South Market - Suite 1400
8                        San Jose, California  95113
                   BY:  **DAVID C. BOHRER, ATTORNEY AT LAW**

9

10   For Defendants Ameriprise Financial, Inc., and Ameriprise
     Financial Services, Inc.:

11                       DORSEY & WHITNEY LLP
                        1400 Wewatta Street - Suite 400
                        Denver, Colorado  80202
12                 BY:  **GREGORY S. TAMKIN, ATTORNEY AT LAW**

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>**Wednesday - December 4, 2013**</u>                                    <u>**11:12 a.m.**</u>

2                          <u>**P R O C E E D I N G S**</u>

3                            **---oOo---**

4        **THE CLERK:**  Calling Civil 13-5160, XimpleWare versus

5    Versata.

6       Please state your appearances.

7        **MR. RUSSO:**  Thank you.  Jack Russo of Computerlaw

8    Group, and with me is Ansel Halliburton as well, representing

9    plaintiff XimpleWare.

10       **THE COURT:**  Okay.  Good morning.

11       **MR. RUSSO:**  Good morning, Your Honor.

12       **MR. ALAVI:**  Good morning, Your Honor.  Amir Alavi and

13   I won't give you the full firm name.  It's AZA Law is the

14   shorthand.  I'm here with Ben Foster and Dave Bohrer on behalf

15   of the Versata defendants.

16       **THE COURT:**  And your last name is?

17       **MR. ALAVI:**  Alavi, A-L-A-V, as in Victor, I.

18       **THE COURT:**  All right.

19       **MR. TAMKIN:**  Good morning, Your Honor.  Dave Tamkin of

20   the law firm of Dorsey & Whitney on behalf of the Ameriprise

21   defendants.

22       **THE COURT:**  Good morning.

23      Have I got everybody?

24       **MR. ALAVI:**  Yes, Your Honor.

25       **THE COURT:**  Okay.  So what we are on for today is

1    XimpleWare -- that's how we say it -- XimpleWare's motion for a

2    TRO and for preliminary discovery or expedited preliminary

3    discovery, and there's been now quite a lot of paperwork filed.

4         My first question, I guess, to you, Mr. Russo, is whether

5    you feel like the representations and undertakings that Versata

6    has presented will reduce or eliminate the problem you see.

7         **MR. RUSSO:**  Your Honor, we welcomed what they did;

8    however, they did not say that it has been effective, and I

9    searched --

10        **THE COURT:**  Let's say they were to.

11        **MR. RUSSO:**  If they were to say it's been effective

12   and Ameriprise has, in fact, installed the patch, the one

13   continuing issue we have, and there's not been a single mention

14   of it in any of their papers, is what they did in removing our

15   copyright notice, and they don't at all address that issue.

16        They took our copyright notice out of the software.  They

17   created a number of copies and distributed, and their clients,

18   customers, Ameriprise, in turn made a number of copies without

19   our copyright notice.  That means they're circulating now

20   without our copyright notice and thereby setting up the

21   potential for other persons who could claim innocent

22   infringement or innocence defense.

23        They would have to then send out patches that say, "On all

24   the software that you have that has the XimpleWare software,

25   you have to install this patch that reinserts the copyright

1  notice because, in fact, we took that out."

2      They should not have done that.  It was a wrongful act.

3  It, in fact, in our view, takes them entirely outside the

4  benefits, any potential benefits, of the license that was

5  available under the GPL.

6          THE COURT:  So your concern, then, is that if they do

7  what they say they will do or can do or have done, if they do

8  that and it's effective, and then in addition if they

9  communicate with prior customers to whom they've sent this

10  program and send them a patch that will reactivate the

11  copyright notification, if all of those things happen, will the

12  immediate issue that you're concerned about have been dealt

13  with?

14          MR. RUSSO:  Yes.

15          THE COURT:  Okay.  Who's -- are you Versata?

16          MR. ALAVI:  Yes, Your Honor.

17          THE COURT:  Okay.  So how hard would it be to send out

18  this patch re-introducing or re-upping the copyright notice?

19          MR. ALAVI:  Well, I don't know the answer to that

20  question because the copyright notice has never been removed

21  from the XimpleWare software.

22          THE COURT:  Okay.  So tell me about that.

23      And you listen and you tell me if you disagree with what

24  he's saying.

25          MR. ALAVI:  So let me say this:  If you look through

1    Mr. Russo's papers, which we've done, there is not a single

2    citation to a single bit of evidence that Versata has removed

3    the copyright notice from the XimpleWare software.

4            **THE COURT:**  Look, I think that we are doing this on a

5    very rapid turnaround, and I think the evidence on both sides

6    is nonexistent, so I'm not concerned about evidence.  I want to

7    know what his real concern is and what your representation is

8    that your client can do or has done.

9            **MR. ALAVI:**  And, so, the reason I raise that is

10   because this is a red herring.  My client, and we've looked

11   into this, and Mr. Foster is helping with this, has never

12   removed any copyright notice from any XimpleWare software.

13           **THE COURT:**  Did you know that, Mr. Russo?

14           **MR. RUSSO:**  No, Your Honor.  I've been told the

15   opposite.

16           **THE COURT:**  You have been told the opposite?

17           **MR. RUSSO:**  I've been told the opposite.

18           **THE COURT:**  By whom?

19           **MR. RUSSO:**  We asked, in fact, for some information

20   from Ameriprise, we asked for what's the situation in terms of

21   copyright and copyright notice.  We were told, "We don't have a

22   copyright notice.  We can't see a copyright notice."  That's

23   what we were told.

24       Now, if they want to say that they can prove or show us

25   that all these copies that were sent out included our copyright

1  notice, fine.  That's a simple thing for them to do, in which

2  case they clearly have our copyright notice.

3        THE COURT:  Okay.  So you say you didn't take it out,

4  so then you'd be able to do that --

5        MR. ALAVI:  Well, yes; and I don't think we --

6        THE COURT:  -- if you have to.

7        MR. ALAVI:  Let me take a step back because I think

8  Mr. Russo needs to delve into how the software works.

9        The copyright notice is contained in the source code.

10  What was delivered to Ameriprise was object code, was the

11  XimpleWare object code.  So, of course, when Ameriprise goes

12  and looks at the object code, they're not going to see the

13  copyright notice because the copyright notice is contained in

14  the source code.  So this is, again, a red herring.

15        Now, I don't know if Ameriprise's lawyer, in fact, told

16  Mr. Russo that.  We have a separate dispute with Ameriprise and

17  their counsel about these issues.

18        But the requirement there be a copyright notice in the GPL

19  license is contained in the provision dealing with distribution

20  of the source code.  If you distribute the source code to a

21  third party, you must retain the copyright notice that is at

22  the very beginning of the source code file.

23        THE COURT:  And you're saying you didn't give them

24  source code, you gave them object code?

25        MR. ALAVI:  That's correct, Your Honor.  So nothing

1  has been stripped out of the source code and then delivered to

2  any customers.

3      With respect to Ameriprise, what was delivered to

4  Ameriprise was the object code file, at least that's what

5  Ameriprise has been able to find on their systems.  If the

6  source code was delivered to Ameriprise, it would have been

7  delivered as downloaded with the copyright notice attached.

8      There has never been by Versata an attempt to remove any

9  copyright notices from source code and then deliver it to its

10  customers.

11      Now, when I -- if you want me to put that into a

12  declaration, you know, it's upon investigation.  I mean, we've

13  talked to the people involved, we've done our investigation,

14  and that's just not the way Versata used the XimpleWare source

15  code.  Mr. Russo has a fundamental misunderstanding of what

16  Versata did with the XimpleWare software product.

17      **THE COURT:**  So you're saying, "Whether what we did is

18  right or wrong remains to be seen, but what we did was use the

19  source code intact, stuck it in our program, made it into

20  object code, and sent it off"?

21      **MR. ALAVI:**  No.  No, Your Honor.  When you go to the

22  website to download XimpleWare software, you can download both

23  the source code and the object code.  It comes in object code.

24      **THE COURT:**  Okay.

25      **MR. ALAVI:**  What we delivered to Ameriprise was the

object code as downloaded from the site that XimpleWare uses to

allow people to download their software.

       **THE COURT:**  Okay.

      **MR. ALAVI:**  We did not take the software, modify it,

copy it, or incorporate it into any software that Versata uses,

and we certainly did not remove any of the copyright notices

from the source code that XimpleWare allows people to download.

       **THE COURT:**  Did you understand that to be the case?

      **MR. RUSSO:**  No.

       **THE COURT:**  If it were the case, and you don't have to

accept it as true, but if it were the case, are you less

concerned about what's going on here?

      **MR. RUSSO:**  I'm as concerned because the whole

intention of the GPL license and the whole way it works is that

any form of distribution has to include, and you can read it in

paragraph 3 that refers back to paragraph 1, you must include

the copyright notice.  You must give attribution.

     Put differently, if you're going to try to come within the

GPL rules, which they purport to do but they didn't, put that

to one side, if you're facially trying to do that, you have to

put on the distribution disk or other media, "This has in it

GPL-compliant software and it's from XimpleWare, and you can

get the source code here."

     The whole rationale, and you read it at paragraph 3, that

says, "If you decide to do it, you have to follow the rules of

1   paragraph 1."  The rules of paragraph 1 include using the

2   copyright notice.  You must give the author attribution.

3        That said, they chose not to do it.  In fact, the way

4   Ameriprise found out is they hired an expert, Dr. Collins, and

5   Dr. Collins went through the software and discovered, as a part

6   of his analysis, and it's in Docket 14-7, his report, there was

7   something like 361 instances of our software in some 700 of

8   their components.  That's in the litigation file that they're

9   in litigation with Ameriprise from a sworn witness that's now a

10  part of this record in that Docket Number 14-7.

11       So I understand what Your Honor is trying to do.  I'm not

12  trying to be difficult, but I do think they owe us the duty, if

13  they're going to do the right thing -- in fact, I think some

14  courts would say, "You have to actually get that software back

15  from those people.  They shouldn't have it to begin with."

16       All of those customers, if they don't -- according to

17  them, "Well, this was a simple task.  We sent a patch out.  We

18  don't even use your software."  Well, that software should come

19  back.  All that software should be returned.  That software

20  shouldn't remain in the hands of others where it can be

21  redistributed without a copyright notice.  That's not the way

22  the rules work.

23       So that is our concern still.

24          **THE COURT:**  Okay.  I think I understand what you say

25  you've done and what you're concerned about them having done,

1  even if a lot of what he says is true.  So tell me how you're

2  being irreparably damaged.

3          **MR. RUSSO:**  So let me start with an analogy that's --

4          **THE COURT:**  Well, yeah.

5          **MR. RUSSO:**  -- applicable, if I could.

6          **THE COURT:**  Yeah, an analogy if you have to.

7          **MR. RUSSO:**  An analogy would be helpful, and then I'll

8  get to the point of where we're going with this.

9       We have in the United States, and have had for quite a

10  while, an open public library system.  It's been diminishing

11  over time and it now seems to be replaced by a Google-based

12  public library where you can see parts of books, you can even

13  download.

14          **THE COURT:**  I want to know where your irreparable

15  injury is because the rules that used to give you a

16  presumption, don't give you the presumption anymore.

17          **MR. RUSSO:**  Understood, and I agree that's the law,

18  Your Honor.  There's no question about that.

19       In this case what is true is some number of multiple

20  copies of our software are out there with no copyright notice

21  on them under some form of distribution that they've chosen to

22  make, which all of those other customers that have our software

23  and have multiple copies of it can choose to make multiple

24  copies just the way Ameriprise has done and said, "We're

25  innocent.  We're innocent because we didn't know about any of

1   this stuff."

2       That's irreparable injury.  We have lost control of

3   multiple copies that no longer even bear our copyright notice.

4       Had they put the copyright notice in and kept the

5   copyright notice in, at least we could say, "Those parties are

6   going to be as strictly liable as they are," putting aside all

7   the other defenses that might be asserted about whether this is

8   within the license or outside the license.

9       If you take a book author's copyright notice out and hand

10  out a bunch of books and take them into distribution, that

11  author has lost control of copies that others can say, "I

12  didn't see a copyright notice, so I just made more copies of

13  this stuff, and I can do it over and over again because I don't

14  see a copyright notice.  And until I'm either enjoined or get

15  some actual notification from someone...."

16      Another alternative is they could give us their full list

17  of all the people that have gotten the software, and we'll send

18  out a notification to them, Your Honor.  We'll send the

19  notification that says, "Make sure you put this notice onto

20  each copy of our software," and we'll make sure each of those

21  parties have done it.

22      They can't leave it out there in the open unresolved.

23  That's irreparable injury here, and it is a distinguishing fact

24  in this case that we have raised and they have not addressed in

25  any of their papers.  We raised it in our declarations.  We

1    said, "There is a loss of control from the lack of our

2    copyright notice being on the copies that you distributed."

3         Counsel's admitted as much.  He just says, "Well, it's

4    object code so we don't have to do it.  We don't have to use a

5    copyright notice."

6              **THE COURT:**  All right.  So what do you say?

7              **MR. ALAVI:**  Your Honor, I think Mr. Russo's argument

8    is an interesting argument but it ignores the reality of how

9    enterprise software is distributed and used by Fortune 500

10   companies, and that's who we're talking about.  We're talking

11   about Fortune 500 companies that received Versata Software, as

12   well as the XimpleWare software, pursuant to a master license

13   agreement that has restrictions on their ability to distribute

14   the software outside their enterprise.

15        So the idea that a company like Ameriprise, who has a

16   license agreement with Versata that prohibits their ability to

17   distribute the software that they have received to anyone else,

18   would suddenly distribute the XimpleWare software all over the

19   world, it's not believable.

20        And there's certainly no evidence that any of Versata's

21   customers, who all have agreements with Versata that restrict

22   their ability to use and distribute the software they've

23   received, are going to go out and distribute the XimpleWare

24   object code to the rest of the world.  Not a shred of evidence

25   of it and it doesn't make sense given the types of customers

1    that we're dealing with.

2        You expect that Prudential who they've sued, Ameriprise

3    who they've sued, they've sued nine of our customers in a

4    corresponding patent case, are going to go out and --

5            **THE COURT:**  All right.  Tell me about that.  I don't

6    know about that.

7            **MR. ALAVI:**  Well, that's part of this case.  There are

8    two cases on file.  Mr. Russo has filed this copyright case --

9            **THE COURT:**  Right.

10           **MR. ALAVI:**  -- against Ameriprise and Versata.  He's

11   also filed another case, a patent case, against Versata.

12           **THE COURT:**  In this district?

13           **MR. RUSSO:**  In this district.

14           **MR. ALAVI:**  In this district.

15           **THE COURT:**  Who has it?

16           **MR. ALAVI:**  It's been assigned to --

17           **MR. TAMKIN:**  Magistrate Judge Grewal, Your Honor.

18           **MR. ALAVI:**  Grewal.

19           **THE COURT:**  Is it going to stay with him?

20           **MR. RUSSO:**  We've said that's fine with us.  We don't

21   know if they'll agree with that.

22           **THE COURT:**  And it's not just you?

23           **MR. RUSSO:**  Right.  It's different parties,

24   Your Honor.

25           **THE COURT:**  Who's the patent case against?

1        **MR. ALAVI:** It is against Ameriprise --

2        **MR. RUSSO:** XimpleWare versus Ameriprise and a host of

3 their --

4        **MR. ALAVI:** I can tell you the names, Your Honor.

5        **MR. RUSSO:** -- customers.

6        **MR. ALAVI:** They've sued Pacific Life Insurance

7 Company, United Healthcare, Metropolitan Life Insurance

8 Company, the Prudential Insurance Company, Wellmark,

9 Waddel & Reed, and Aviva.

10        **THE COURT:** And that's a patent claim?

11        **MR. RUSSO:** Patent suit.

12        **THE COURT:** And all this stuff that you're worried

13 about the copyright is also patented?

14        **MR. RUSSO:** Yes, parts are patented, but the copyright

15 is broader on the software than the patent is on the particular

16 method that's implemented.

17        **MR. ALAVI:** So, Your Honor, when we talk about --

18        **THE COURT:** And which case was filed first, the patent

19 case or this case?

20        **MR. ALAVI:** The copyright case by minutes.

21        **THE COURT:** Same day?

22        **MR. RUSSO:** One was -- yeah, the same day, Your Honor.

23        **THE COURT:** Do you think those cases are related?

24        **MR. RUSSO:** We actually internally debated that, and

25 some of the back and forth that we had actually had at some

1   point with someone or several defendants was they were likely

2   going to move to stay that case anyway because the result was

3   they were going to go to the Patent Office and do what people

4   do in the Patent Office these days, which is to do some type of

5   reexam.

6         **THE COURT:**  Right, but very often those cases don't

7   get stayed, as you no doubt know.

8         **MR. RUSSO:**  I know.  We debated internally whether

9   they should be consolidated.  We, frankly, didn't do it as a

10  strategy.  We did it as just a recognition that there's

11  probably going to be two separate tracks based on what happens

12  with the patent in the Patent Office just because of what

13  usually happens given the new Act.  People do some

14  post-examination review.  This patent has not been through a

15  post-examination review yet.

16        That said, Your Honor, I do want to address one thing that

17  I found entertaining, and I think you will -- you have or will

18  as well.  They say they don't have to worry because we have a

19  master license.  That's the very thing that they sued

20  Ameriprise over because Ameriprise apparently turned the

21  software over to a third party in India called Infosys

22  regardless of the master license, and that's their Texas

23  lawsuit for breach of the master license against Ameriprise.

24        So on the one hand they're here saying, "The master

25  license protects everything.  We don't have to worry about a

1   thing."  On the other hand, in that lawsuit they say,

2   "Ameriprise took the software and gave it to a bunch of

3   outsource parties in India to do a reverse engineer."

4           THE COURT:  I just don't see how this case isn't a

5   small piece of the patent case.  I don't know why it's here

6   separately from the patent case.

7           MR. ALAVI:  Your Honor --

8           THE COURT:  Because you've got your patent issues and

9   then you've got this issue.  We're struggling to find some

10  irreparable injury.  And you've got some theoretical

11  consequences that you're able to articulate.  That plus 50

12  cents maybe will get you a cup of coffee.  I don't know.  But

13  your real issue, then, I take it, is going to be the patent

14  thing.

15          MR. RUSSO:  It's actually not the way we see it,

16  Your Honor.  The patent case is really a distinct set of

17  issues, very distinct set of issues.

18      We think the copyright case is one that if you were to

19  say, I know you can't, tomorrow, "Hey, let's go to trial on

20  this case," we could try this case tomorrow.  We'd have to get

21  some discovery and evidence that we're entitled to from them

22  about exactly what they did, which Dr. Collins apparently has

23  and we'll subpoena him and get that; but at the end of the day,

24  once a commercial party takes software and engages in

25  distribution of that software, they have to strictly follow

1    some very strict rules that they didn't follow here.  It's

2    really that simple.

3        I think you'll hear Ameriprise counsel agree, because

4    that's their position in the Texas lawsuit, that Versata did

5    not follow those rules; therefore, there is no license.

6        Now, here they say, "Hey, we're an innocent party so don't

7    tack us for anything"; but they're not also here saying, "We've

8    installed the patch."  You would think if this patch has sort

9    of solved everything, they'd be here saying the same thing in

10   their paperwork, "Hey, we've installed the patch.  No harm, no

11   foul.  Leave us alone."

12       **THE COURT:**  Well, I guess they're not really normally

13   at the same table.

14       **MR. ALAVI:**  That's right, Your Honor.

15       **MR. TAMKIN:**  We are not normally at the same table,

16   but in this case we are because the problem that Your Honor

17   pointed out, which is, if I may --

18       **MR. ALAVI:**  I'll move over, Your Honor, to make some

19   room.

20       **MR. TAMKIN:**  -- which is --

21       **THE COURT:**  The record should reflect they're now at

22   the same podium.

23                          (Laughter)

24       **MR. TAMKIN:**  We are sharing a podium.  Thank you.

25       There is no irreparable harm here because this is a

1   situation where in Ameriprise, in the practice of Ameriprise,

2   the allegations are, which would be the same for any customer,

3   that they received the DCM software and they use it, and use is

4   licensed.  Use is nothing more.

5       The actual factual allegations in the case are that

6   Ameriprise uses it internally.  That's in paragraph 60 of the

7   Complaint, 61 of the Complaint, as well as the only factual

8   allegations, if there are any factual allegations about

9   Ameriprise, it's that, that they internally use the software.

10      And that's the way it works.  It's a product that is

11  not -- Ameriprise doesn't sell it.  Ameriprise doesn't --

12  Ameriprise uses it to run its business, to manage a whole bunch

13  of financial advisers; but because of that, Ameriprise is only

14  using it.

15      So when Mr. Russo says, "Well, the fact that all these

16  people are using it and can distribute it and the copyright is

17  somehow lost because -- or the right to control it is lost,"

18  that's not really true from a use perspective by the ultimate

19  customers.

20      In the end of the day, I agree that many things were not

21  complied with with respect to the GPL.  That's true, and I

22  agree with Mr. Russo about that; but that doesn't mean that

23  there's irreparable harm here in any way, shape, or form

24  because use is allowed.

25      Moreover, as set forth in Mr. Collard's declaration, which

1    is attached to our papers, you can go and download this to use

2    it today.  Everybody in this courtroom can go and download the

3    product to use it today.  There are restrictions on

4    distribution, but anyone can use it.

5         If anyone can use it, no one has -- and, frankly, not only

6    use it and modify it in accordance with the GPL, then there is

7    no lack of control or loss of control of the software.

8    Everybody gave that up on day one when one made it available.

9    You have to comply, but you can certainly use it and use

10   doesn't require any compliance.

11        **THE COURT:**  And you're entitled, though, to have your

12   copyright trail along with it; is that true?

13        **MR. TAMKIN:**  You are entitled to have your copyright

14   trail along with it, but that use doesn't really -- using it

15   doesn't implicate any of that because the point is, as

16   Your Honor pointed out, it's to trail along with it.  It's not

17   going anywhere when I just use the software.

18        If I distribute the software, then, of course, that

19   copyright notice needs to be provided, the source code needs to

20   be provided, et cetera.  But if I just use the software, and

21   that's what's, you know, alleged against Ameriprise, then there

22   is no copyright issue in terms of Ameriprise passing that on

23   because Ameriprise isn't distributing it.  None of the

24   customers in this kind of a context, I wouldn't think, are

25   distributing it, although Versata's counsel would know more

1   accurately.

2        **MR. ALAVI:**  And, Your Honor, if I may, I know you've

3   talked about the irreparable injury, let's talk about this

4   copyright issue.

5        Mr. Russo's claim is, "Oh, other people will distribute

6   the software."  I've talked about why that's unlikely and

7   there's no evidence of it happening.

8        There's an evidentiary standard here.  It's not just

9   argument of counsel.  I mean, Mr. Russo has to demonstrate that

10  our customers who have XimpleWare are likely to distribute the

11  software, which he can't do.

12       But even beyond that, there's no irreparable injury

13  because XimpleWare can recover damages.  They have, in fact,

14  sued Versata for damages for indirect copyright infringement.

15       When you have a damage remedy with a solvent defendant, it

16  is very difficult, very difficult to demonstrate irreparable

17  harm.  There are ways you can do it, but not by standing up and

18  saying, "We think that Fortune 500 companies are going to take

19  software that they've received from Versata, are going to copy

20  it and distribute it to the whole world," without a shred of

21  evidence to indicate that, "and when we can turn around and sue

22  Versata for indirect copyright infringement and seek damages

23  for that problem."

24       **MR. RUSSO:**  Your Honor --

25       **MR. ALAVI:**  That is not an irreparable-injury-type

1    case.

2         And you have to question what the imminence is.  Mr. Russo

3    has known about this since July.  They filed their copyright

4    notice in September.  Everyone knows in software cases that

5    when you file a copyright notice, you do it to gear up for

6    litigation.

7         He filed the lawsuit in November, and the only time he

8    raised the issue of a TRO was after Ameriprise set a subpoena

9    for hearing in State Court for their witness.  And he sent us a

10   letter saying, "I'm not presenting my client for a deposition.

11   You get him once in all three cases; and if you don't, I'm

12   going to file this TRO."  That's attached to our papers.  And

13   that was almost a month after he filed this case.

14        If he thought there was an imminent danger, you would have

15   thought that he would have sought the TRO much earlier than he

16   did.  This looks like more of an attempt to try to leverage

17   discovery.

18        And, remember, in a patent case, where you have patent

19   rules, where they have to deliver their infringement

20   contentions before we engage in discovery, he wants to bypass

21   all of that in that case, which has not been designated as

22   related and should have been, and take discovery on the

23   copyright and patent case on an expedited basis in this case

24   without giving my client or Ameriprise the opportunity to take

25   discovery, get written documents.

1       I don't even know what the discovery he wants is.  He says

2   it's limited, but there's no description of what he wants.

3       So at the end of the day, without irreparable injury,

4   there's no TRO and there should be no expedited discovery.  We

5   should get these cases consolidated, they should be designated

6   as related, and we should follow the rules.

7           THE COURT:  I'm not suggesting that they should be

8   designated as related.  I was asking the question.  Please

9   don't think I'm inviting that to happen.

10          MR. ALAVI:  Your Honor, we think it should be

11  designated as related, and I'll give you a good example why.

12      Ameriprise has filed a motion to dismiss this copyright

13  case on the basis that they are licensed.  They filed literally

14  the exact same motion in the patent case.  It's -- the license

15  that is a defense to this copyright case for Ameriprise is the

16  exact same defense to the patent case.

17      There is no reason why these two cases should be litigated

18  separately.  Now, ultimately that's for the Court when they get

19  a motion -- when the Court gets a motion to decide, but we

20  think this should have at least been designated related.  We

21  don't know why it wasn't, but it should have been.  Same

22  parties.  There's additional parties in the patent case.  Same

23  piece of software.  Same purported defenses.

24          THE COURT:  All right.

25          MR. RUSSO:  Your Honor, three things.  One, I think

1   counsel will agree he misspoke when he said that the copyright

2   notice was filed in September.  I think he meant the copyright

3   registration.  That should be clear.

4       Secondly, Docket 14-7 is an important piece of evidence

5   well beyond a shred of evidence, declarations and briefing by

6   Ameriprise, including Dr. Collins.

7           THE COURT:  Isn't that all hearsay to me?

8           MR. RUSSO:  No, Your Honor.  It's exactly --

9           THE COURT:  It's in a different case; right?

10          MR. RUSSO:  It is in a different case, but it's a case

11  that's been fully litigated against parties that are adverse in

12  which there's statements made under oath that there is actual

13  incorporation of our software in their software.

14          THE COURT:  Well, I've been wondering about that.  I

15  don't really think I get there, but I think most of what has

16  been presented to me is hearsay.  That's what it looks like,

17  because it's a different lawsuit.

18      You're allowed in a case in a summary judgment proceeding

19  to file declarations and they're treated as evidence, but I

20  don't know that you can take those declarations from one place

21  and import them as evidence in another place.  It's just not

22  clear to me.

23          MR. RUSSO:  It's the exact software, Your Honor, that

24  we're talking about in this case and the exact issue with an

25  expert who has looked at this exact question because these

1   parties are exactly, even though they're both at the podium

2   now, they're exactly adverse on this question.

3       And that's the interesting part of this story here because

4   XimpleWare took time, and we did take time, we tried to get a

5   settlement with these guys for umpteen -- if I go back to the

6   original letter that said, "Hey, we'll file suit and seek an

7   injunction," it's well before this whole discovery issue.

8       We took cycles to try to get to a settlement with all

9   these corporate guys.  This is a small company.  It's a tiny

10  company.  I mean, it's not anywhere near one tenth of 1 percent

11  of the size of either of these giants; and at the end of the

12  day, they didn't want to be in a lawsuit and they certainly

13  didn't want to be in two lawsuits.

14      And when the subpoena came in, it was another surprise.

15  Now we're going to be in three lawsuits.  Okay.

16  Judge Manoukian the day before yesterday said, "Whatever

17  Judge Illston wants, in fact I'm going to see her next week,

18  just make it clear in the order.  She can control the discovery

19  on all this because I don't want anyone to be taken advantage

20  of.  Sooner or later" --

21          **THE COURT:**  Tell him thanks a lot; will you?

22          **MR. RUSSO:**  He said, "Sooner or later, Mr. Russo, you

23  know that you're going to have to have your client show up."  I

24  said, "Of course."

25      We've been trying to negotiate a deal on this case, not on

1  every single case, on this case.  "No, there will be no

2  discovery.  We're really sorry.  Until you get your turn,

3  you'll get your turn."

4      Now, at the end of the day I wanted to get back to a

5  point, which is, if we could do the expedited discovery, we

6  would go to trial if it was allowed by you; or if Judge Grewal

7  has more time and they want to stipulate that Judge Grewal will

8  handle everything, I think he'll hold two separate trials

9  because I do think the copyright case can go to trial much

10  faster than the patent case.

11      And I do think, notwithstanding what they're saying,

12  somebody of all these litigants is going to file something in

13  the Patent Office because it has become a standard of care for

14  defense counsel to go to the Patent Office in the new world of

15  the new Patent Act, and there's going to be probably a year or

16  two delay in those Patent Office proceedings.  That's just the

17  way it works in my experience.

18      And, so, we can do the copyright case and try that; and if

19  it's with Judge Grewal, we're happy with that.  We're not

20  against it.  At one point we said, "Let's go before

21  Judge Cousins even," because we know district judges are busy

22  here.  And they said, "Well, we'll think about it," and they

23  thought about it and changed their mind.

24      We're happy to be before Your Honor as well if we want to

25  go in the other direction.  I think Judge Grewal probably has a

1    lot more time than you do just based on how quickly we've seen

2    other cases go in front of him.

3           **MR. ALAVI:**  Your Honor, if I may, and tell me to stop

4    talking.  I know when to stop talking when a judge tells me to

5    stop.

6           But the subpoena in the Texas case, we have a trial set in

7    that case in February.  We need to conduct discovery; and

8    because of the defenses that Ameriprise has raised on this

9    XimpleWare software, we need the deposition.

10          And, so, the idea that we should consolidate the discovery

11   in these three cases and force defendants in a copyright case

12   and a patent case to go through expedited discovery because

13   there's a February trial setting doesn't make sense.

14          Mr. Zhang from XimpleWare is just going to have to be

15   deposed more than once, and we will take great care in the

16   deposition on Friday to limit it to the issues in the

17   State Court case.

18          I keep hearing about the hearsay that Mr. Russo attached

19   to his motion.  He pointed out, for example, the expert

20   declaration from Ameriprise.  One thing Mr. Russo didn't attach

21   would be our summary judgment response in that case where we

22   have an expert from M.I.T. who disagrees with Mr. Collins, who

23   fundamentally disagrees with Dr. Collins' arguments that the

24   XimpleWare software is incorporated into the Versata software.

25          So that's the problem with hearsay and that's the problem

1   with selective hearsay.  The reality is --

2           **THE COURT:**  That's the problem with experts.

3           **MR. ALAVI:**  That's true, but we didn't add all that to

4   our response because XimpleWare doesn't pass go.  There is no

5   irreparable injury here.  There is no imminent harm.  They have

6   a remedy for damages and this TRO should be denied on that

7   basis.

8           **MR. TAMKIN:**  Your Honor, if I may follow up on two

9   points as well, which is, number one, that Judge Manoukian's

10  order is actually attached -- or proposed order that the

11  parties have agreed to is actually attached.

12          **THE COURT:**  Oh, it is?

13          **MR. TAMKIN:**  It is the proposed order that the parties

14  have agreed to.  I want to make clear, however, it was

15  Ameriprise's petition and, so, only Ameriprise and XimpleWare

16  have agreed to this form of proposed order.  It is

17  Document 39-9.

18      And that that makes clear in Section 3 of the order, I

19  believe:  (reading)

20              "The scope of the questioning at the deposition," and

21      I'm reading verbatim, "is limited to the matters relevant

22      to the Texas action pending in Travis County."

23      In other words, Judge Manoukian made it very clear that,

24  "This is not going to relate to the federal cases; I'm not in

25  any way getting involved in that.  And if Judge Illston" --

1          **THE COURT:**  By the way, I'm sorry to interrupt, did he

2     sign whatever that order is?

3          **MR. TAMKIN:**  He has not.  He has not signed it.  He

4     has -- this was what he ordered at the hearing, though, asked

5     the parties to submit a proposed order.  The parties then

6     thereafter worked together to agree that this, in fact, is what

7     it was.

8          **MR. RUSSO:**  We fully expect him to sign it,

9     Your Honor.

10          **THE COURT:**  Okay.

11          **MR. TAMKIN:**  I don't want to misrepresent.  We do as

12     well.

13          More importantly, he also states, not that Judge Illston

14     should do whatever she's going to do, but that all the

15     foregoing is without prejudice to the decision of Judge Susan

16     Illston in the pending Federal Court action entitled XimpleWare

17     versus Versata, et al., to stay, modify, or otherwise change

18     the deposition.

19          So, in other words, if this Court is going to order

20     expedited discovery, then if there's a need for coordination,

21     there is a need for coordination.  But right now, as it stands,

22     we have a deposition scheduled for this Friday, both Mr. Alavi

23     and myself are here ready to take it, and that is going to go

24     forward on just the issues in the Texas case.

25          **THE COURT:**  And the trial in Texas is in February?

1    **MR. TAMKIN:**  February 24th we have -- and we have,

2    under Texas, Mr. Alavi can explain better, a Rule 11 letter

3    which requires us to get -- it's a different Rule 11 -- all of

4    our discovery, already named witnesses, completed by

5    December 20th.

6    **MR. ALAVI:**  We have a -- so in Texas Rule 11 is a

7    procedure for stipulations.  It's not Federal Rule 11.  In

8    order to get the February trial setting, because there was a

9    continuance, the parties agreed to complete the discovery of

10   previously identified witnesses by December 20th, and the

11   XimpleWare corporate rep is one of those witnesses.

12   **MR. TAMKIN:**  Right.

13   So -- but on the question of expedited discovery, one of

14   the things that XimpleWare needs to show is that there is good

15   cause for expedited discovery.  Preliminary Injunction alone is

16   not good cause.  What there has to be is good cause to do

17   expedited discovery ahead of the scheduled discovery in the

18   case.

19   And what there's been argument is:  We need discovery.  We

20   need discovery like in any case you need discovery.  But here

21   there's no immediacy to this, so the Court needs to also look

22   at the immediacy prong and the irreparable harm prong.  What's

23   the -- what is the rush here?  What is the rush to do expedited

24   discovery?  Simply because you file a motion doesn't mean you

25   do expedited discovery.

1      The last point I want to make is with respect to the

2  allegations and this hearsay issue of Dr. Collins.  Whether

3  it's hearsay or not hearsay, what Dr. Collins says, and I

4  certainly agree with him, is that all of -- is that the

5  XimpleWare software is incorporated into the object code.

6      Whether that's true or not, however, doesn't answer the

7  question of whether, for example, Ameriprise copied it,

8  distributes it, things like that.  That issue still hasn't been

9  proven.  Simply because Dr. Collins says it's incorporated

10 doesn't mean that it is -- that Ameriprise is in violation of

11 the GPL.  So there's no success prong.  There's no analysis to

12 that prong.  It's simply one fact, which is in fact hearsay.

13      So we don't think that a TRO is warranted because there's

14 no immediate or irreparable harm.  Certainly no likelihood of

15 success.  We actually filed a motion on this yesterday because,

16 in fact, with respect to Ameriprise we are licensed because we

17 don't do anything wrong.

18      And, in fact, Section 4 of the GPL, and this is quoted in

19 our papers, specifically says even if Versata is not licensed,

20 the customers of Versata still are as long as they comply with

21 the GPL; and there's no facts in the record that say that

22 Ameriprise has not satisfied the terms of the GPL.

23      **MR. ALAVI:**  And, Your Honor, if I may, to help

24 Mr. Tamkin out, I don't think he reads paragraph 4 strongly

25 enough.  Paragraph 4 of the GPL says that if Versata, licensee,

1   breaches its agreement and the agreement becomes void, anyone

2   who received the software from Versata continues to be

3   licensed.

4        I mean, it is -- I think that motion to dismiss, when you

5   get to it, will be a simple matter.  I'm surprised that -- I'm,

6   quite frankly, surprised that XimpleWare sued any of the

7   customers given the clear strength of that language in

8   paragraph 4, but there's no doubt that the customers are

9   licensed even if Versata allegedly breached the GPL license.

10        **MR. RUSSO:**  Your Honor, just to be clear, and it's in

11  our papers, Ameriprise does its computing not just with its

12  employees but with many, many independent contractors that

13  carry an Ameriprise franchise.  These are nonemployees.

14        They like to say it's all internal usage.  In fact, the

15  declaration attaches their SEC filing where they say, "We have

16  7400 independent franchisees or contractors."  In other words,

17  they're nonemployees.

18        When they say it's internal, they're somehow saying the

19  enterprise can include all of these other people that get the

20  benefit of the software; and that, to me, is hocus-pocus here.

21  That is not a truthful statement about how the law works.  The

22  law doesn't let you as a company say, "Your employees can use

23  Microsoft Word; and, oh, we happen to have a few hundred

24  thousand contractors we'd like to treat as people who are under

25  our license."  That's not the way it works and that's in the

1  record here.

2      They seem to be playing with, "Hey, it's all internal use

3  so, therefore, we're protected."  That's not true.  It's not

4  all internal use, and we've got the evidence in the record on

5  that.

6      On the discovery question, if I may, because they've taken

7  a lot of time, it seems to me, particularly if there's going to

8  be a Preliminary Injunction hearing and you're going to get a

9  lot more time to look at the paperwork, we should have at least

10  one deposition per side in the copyright case.

11      And if you want to expedite it under Rule 65 to do the

12  trial on the merits, we'll agree to that as well.  We're not

13  here trying to drag our heels at all.  We're not -- we're ready

14  to say, "Give us some discovery and we'll go to trial on this."

15      We think it's a pretty blatant willful infringement given

16  the notice.  Now, they patch, they purport to patch this stuff

17  without saying anyone's actually installed the patch, without

18  saying that anyone's actually returned the software, without

19  saying that anyone's deleted the software, without giving us

20  the names of these people.

21      Again, if they want to give us the names, we'll send the

22  copyright notice out and ask that those parties give full

23  notice and put notice on all copies and confirm that they're

24  not using them anymore.

25      We actually think it's kind of a ruse because the truth of

1  the matter is, for the 25,000 transactions per hour that they

2  advertise their software can do, it can only do it with the

3  XimpleWare software.  There's nothing else available on the

4  market, to our knowledge, that can do that volume of

5  transaction processing.

6      So it's simple enough to send a notice saying, "Please do

7  this."  Whether your customers do it or not is a whole nother

8  question.  The fact that Ameriprise is not here even with

9  counsel saying, "Yes, my client's doing it, my client's done

10  it, or it will get done by Friday," that alone is telling,

11  Your Honor.

12      So it's nice and it's interesting that the CEO says,

13  "Okay.  I'm sending it out.  I've sent out a patch.  And, by

14  the way, this process, because it may take time for people to

15  do it," the inference is very clear.  People are not coming

16  back and confirming that they have done it.

17      So simply by waving his hand -- indeed initially counsel

18  said to me, "Oh, it was only Ameriprise that ever got this

19  software from XimpleWare."  That was his representation.  It

20  makes no sense to us.

21          MR. ALAVI:  Hold on, Your Honor.  I have never spoken

22  to Mr. Russo.  I have never spoken to him, and that is just not

23  true.

24          MR. RUSSO:  Okay.

25          MR. ALAVI:  And --

1        **MR. RUSSO:**  I'm sorry if I --

2        **MR. ALAVI:**  -- I guess I've heard a lot of hyperbole,

3   I've heard a lot of speculation, but that is just not an

4   accurate statement.  You and I have never spoken before today.

5        **MR. RUSSO:**  Well, then there must have been an email

6   exchange because something happened between the two of us in

7   which a bunch of other stuff happened.

8        **MR. ALAVI:**  That is just --

9        **MR. RUSSO:**  We've had communications, Your Honor.

10  Perhaps it was by email.

11       But I have to say that it's far more than XimpleWare and

12  Ameriprise and Versata.  There are other people who have gotten

13  the software as well, and they've apparently sent this patch

14  out.  That's how you started this hearing.

15       It seems to me the right outcome is either they send the

16  copyright notice out; or they give us the list of the

17  particular people and the particular email addresses that

18  received the software, and we'll send the copyright notice out

19  and say it's pursuant to either a stipulation or an order, and

20  we will avoid irreparable injury here.

21       **MR. ALAVI:**  Your Honor, there is no irreparable

22  injury.  Mr. Russo can't talk about it.  It doesn't exist.

23       The idea that we should go to trial on an expedited basis

24  in this case where there are issues as to whether or not

25  XimpleWare even owns the copyright, they've had other people

1    work on the software and develop the software, and there's

2    going to be issues about the validity of their copyright

3    registration when there's a patent case pending and expedited

4    discovery is going to be used to circumvent the proper due

5    course of the discovery in that patent case.

6         They decided to file two cases.  They wanted to pursue

7    litigation.  We can have our Rule 26 conference.  We haven't

8    even answered yet.  Last week we received for the first time a

9    request to waive service.  There are other defendants in the

10   patent case.

11        We should do discovery in these two cases the way

12   discovery is normally done; but the idea that we should do

13   expedited discovery and essentially litigate the patent and

14   copyright case, because that's what we're talking about, in 30

15   to 45 days prejudices the defendants and there's no reason to

16   do it, none whatsoever.  All you've heard is speculation,

17   hyperbole, and hearsay and not a shred of evidence of

18   irreparable injury.

19             **THE COURT:**  Are we all done?

20             **MR. RUSSO:**  I think so.

21             **MR. ALAVI:**  Yes, Your Honor.

22             **THE COURT:**  Okay.  Well, I'll get you a written order.

23   I'm intending to deny the TRO because I don't see at this time

24   irreparable injury.

25        I'm going to take note of the representations that have

 1  been made in the papers about the fact that Versata has no new

 2  customer sales of DCM and does not anticipate closing any

 3  additional sales during the 2013 calendar year; that all

 4  references to XimpleWare of the versions of DCM that have been

 5  created have been removed and a patch has been created which

 6  will be sent to all the customers; all those representations

 7  I'm taking as true and I'm going to require, as time goes by,

 8  that I get proof it did, in fact, happen.

 9      I think some of the points Mr. Russo has made about

10  getting information about who they were sent to and whether it

11  was done or whether it's been implemented are perfectly

12  appropriate, and they need to be followed up on; but I don't

13  see that any of that warrants a TRO at this time.

14      I will say this:  If I keep this case, if it goes to

15  Judge -- it wouldn't go to Judge Grewal.  If it were to, that

16  would be terrific; but if it didn't, I am easily able to try

17  this case in the springtime.  So we can go to trial just as

18  fast as it's ready to go to trial, but I'm not going to issue a

19  TRO at this time.

20      I'll get you a written order to that effect.

21          MR. RUSSO:  All right.  Thank you, Your Honor.

22          MR. ALAVI:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. ALAVI:  May we be excused?

25          THE COURT:  Oh, and with respect to the discovery, I

1   will take another look at that.  At this time I don't foresee

2   granting the request that's been put in these papers.  It's way

3   open-ended and I'm not sure that it's properly targeted to get

4   the information that you would want.

5        If the witness needs to give more than one deposition,

6   that is just, frankly, life.  It happens sometimes.  But if

7   there is targeted, specific information that needs to be

8   presented on an expedited basis in this one case, you can make

9   an appropriate request and I'll take a look at it.

10            **MR. RUSSO:**  All right.  Thank you, Your Honor.

11            **MR. ALAVI:**  Thank you, Your Honor.

12            **MR. TAMKIN:**  Thank you.

13            **THE COURT:**  All right.  Thank you.

14                (Proceedings adjourned at 11:57 a.m.)

15                        ---oOo---

16                  <u>**CERTIFICATE OF REPORTER**</u>

17        I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19

20   DATE:   Thursday, December 12, 2013

21

22

23        _____

24        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

25